## EXCEL AUTO RADIATOR CO. v. LERER.

### No. 12356.

Court of Civil Appeals of Texas. Dallas.

June 4, 1938.

Locke, Locke, Stroud & Randolph and Maurice E. Purnell, all of Dallas, for appellant.

Bromberg, Leftwich, Carrington & Gowan, of Dallas, for appellee.

YOUNG, Justice.

Appellant, Excel Auto Radiator Company, was defendant in the trial court, and appellee E. Lerer, trading as Liberty Smelting & Refining Company, was plaintiff, and in keeping with the briefs of respective counsel, they will be so referred to here. Plaintiff E. Lerer, trading as aforesaid, brought this suit in a District Court of Dallas County against the defendant corporation with an office and place of business in Dallas, Texas, for the price of three deliveries of solder sold during August and September 1935, totalling the sum of $1,648.13. Defendant filed defensive answer thereto, also a cross-action, alleging breach of warranty in the quality of the solder in question, and of other solder previously sold by plaintiff to defendant, resulting in general damages in the difference in the fair value of all solder, as warranted, and that of the alleged inferior solder actually delivered; and special damages in alleged excessive return of defective radiators manufactured from the so-called inferior solder, together with losses sustained in use of excessive quantities of solder which defendant alleged it would not have needed if the metal had been of the warranted quality—a total claim against plaintiff of $6,900.

Upon trial before the court without a jury, judgment was rendered for plaintiff as prayed, and against defendant on its cross-action. No findings of fact or conclusions of law were requested by either party or filed by the trial court.

Previous to December 2, 1933, the date on which the transactions between the parties began, plaintiff had been in the business of buying junk metals, having purchased some from time to time from defendant; being also engaged in producing solder for commercial use. Defendant manufactured automobile radiators and, in its Dallas plant, was required to use in its operations large quantities of solder.

There appears no dispute in the record that, on the occasion of the first purchase of the commodity in suit, defendant's president, Mr. Sam Briskin, being in Dallas, was by plaintiff shown a specimen of plaintiff's solder, and after a conversation

the initial order was made; also very little dispute that plaintiff was familiar with defendant's local plant and the kind and character of solder necessary for its use; and that, on the other hand, defendant, through its Dallas manager, knew that plaintiff smelted his solder from junk and not virgin metal, was acquainted with the testing methods used by plaintiff in determining the quality of the solder which became the subject of purchase and sale between the parties. From the record, we conclude that plaintiff represented the solder he proposed to produce and furnish to defendant as being good for the purposes of defendant's business—that is, 50% tin and 50% lead, with no more than the tolerated content of copper, antimony, or other foreign substances—known in the industry as good 50/50 solder. When the content is 40% tin and 60% lead, it is termed 40/60 solder, such material for use by defendant becoming inferior as the proportion of tin is lessened below 50%; which also applies to its value and cost, tin being a metal of materially higher price than lead. Defendant knew the methods employed by plaintiff, in testing the content of the product it was purchasing, to be by "button scale", which was to take a small sample from each batch of new solder, or a "button", place it on a commercial testing scale, the marker thereon indicating the quantity of tin. This test, plaintiff testified, he applied to all solder sold to defendant, and if in any case the same was found deficient in tin, he would add enough of the latter to make the result a 50/50 compound. The only strictly accurate means of testing the goods manufactured by plaintiff was by laboratory or chemical analysis, the facilities for which not being available in his smelting plant, as defendant knew, but shown by the record to have been equally available to both plaintiff and defendant in Dallas, and to defendant at its home office in Chicago. Over the nearly two years of dealing with plaintiff, the defendant gave purchase orders for two varieties of solder—one for use in dipping radiator cores in a molten bath called block or "ingot" solder; the other being for bar solder, used in assembling the core with other parts of the radiator, which is done by hand.

Defendant's Dallas plant, during the material dates here, purchased from plaintiff more than 50,000 pounds of the two kinds of solder just mentioned, the first order described as bar solder, to be used in putting together radiators as a completed job, being in November 1934; all previous purchases involving stated amounts of 50/50 ingot solder (save as to one order mentioned below), on the basis, usually, of 26¢ per pound. Such dealings were evidenced by 20 purchase orders, 17 of which were paid for and the deliveries under the remaining 3 being for which this suit was filed.

The form of defendant's purchase order was prepared at the Chicago Office, for use in buying supplies and materials for all of its branch offices, and each contained the following provision: "Goods delivered on this order are subject to our inspection and approval. We reserve the right to reject goods that do not meet our specifications or which are received later than the specified delivery date"; each of such forms in suit reciting an order for either a quantity of "50/50 ingot" solder or "50/50 triangular bar" solder, or specified amounts of both. The second purchase order (14404) of date January 16, 1934, however, only called for "500 lbs. of 50/50 solder". All invoices of plaintiff furnished to defendant's office upon deliveries, under the above orders, contained similar data as to quantity, solder description, and price. A small bar introduced in evidence bore the imprint in the mould "50/50 Liberty Solder 50/50". Ingot solder was furnished in blocks, weighing from 1 to 10 pounds; the triangular bar variety just mentioned weighing from $\frac{1}{4}$ to 1 pound.

Referring generally to appellant's assignments and propositions, we believe there was at least a sufficient warranty running through the dealings of plaintiff and defendant, as to the quality of the solder in question, that survived the inspection and acceptance provisions recited in the above order form, and properly became the subject of defendant's cross-action; however, a question of fact was raised before the trial court as to whether plaintiff had fulfilled the obligation devolving upon him as to the kind, character and quality of the metal sold by plaintiff to defendant under such purchase orders. Contrary to the statement of appellant, the trial court made no finding, nor does the record show that the inferences set out under the second proposition of appellant's brief were indulged in by said court. Appellant's statement is that, "The trial court indulged an inference that the defendant's factory manager, Joe Briskin, knew or should have

known that the solder was defective at the time the defendant's factory accepted and used the same, and held, as a matter of law, that acceptance and use of the same with such inferred knowledge of the defective quality amounted to a waiver of the right to rely on the warranty".. We find nothing in the record to indicate that the trial court decided the case upon any one theory or issue. We think there were conflicts in various phases of the testimony, and several theories upon which all issues could have been determined. So, we conclude that appellee's third counter-proposition is well taken, which will necessarily overrule the assignments and propositions presented by appellant, Excel Auto Radiator Company. Such counter-proposition reads: "Since there was a conflict in the testimony as to the quality of the solder which plaintiff sold defendant, and there was ample proof to support plaintiff's contention that all solder he delivered to defendant was good solder, the judgment entered by the court, without the aid of a jury, in favor of plaintiff, should be affirmed".

■ Defendant's testimony in support of its cross-action on breach of warranty consisted in a chemical analysis of two specimens of metal, one from a block of 50/50 ingot solder, taken from the last shipment made by plaintiff to defendant's plant; the other taken from a February 1934 shipment of bar solder, according to the statement of the branch manager of defendant. These specimens tested out under laboratory and chemical analysis, generally, as 40/60 solder, each containing excess percentages of foreign substances—such as copper, antimony, etc. It is not disputed in the record that the last shipment of 1,000 pounds of ingot solder was delayed in delivery by plaintiff's lack of tin element to produce a 50/50 solder, and defendant's manager being apprised of the reason of delay, directed a delivery of the shipment, knowing same to have a lower than the usual tin content; accepting and using the same with such knowledge. Plaintiff admits that the last solder that was sold contained no more than a 40 percentage of tin. Hence, the trial court could fairly conclude that a chemical test of the metal out of the last shipment was hardly sufficient to condemn all of the solder named in the purchase orders over an almost two-year interval as being wholly inferior. The bar solder, which was tested chemically by Dr. Landon C. Moore, came out of the second or third purchase and around February 1934, from the testimony of defendant's manager. It is not clear from an examination of all the purchase orders that bar solder was being delivered to defendant at such time, unless the shipment of January 16, 1934, above mentioned, involved this kind of merchandise. It was evidently used in much smaller quantities than the ingot solder, else there would have been none on hand out of a February 1934 supply to have been available for a chemical test in November 1935. Aside from this, however, we conclude that the trial court, from all the transactions and evidence before him, including the analysis of the chemical experts, could reasonably have accepted the statements of the plaintiff Lerer that every shipment sold was good solder, in accordance with the "button scale" test, and was in full satisfaction of the understanding between the parties. We overrule appellant's assignment as to error committed by the trial court, in permitting plaintiff to testify that the shipments of solder were without reference to any chemical test. As appellee points out, this testimony of plaintiff merely negatived defendant's inference that it was agreed that all solder should be tested by the chemical analysis method. Under the circumstances, it was properly in rebuttal of the testimony of defendant's manager, already before the court without objection.

■ So, there being no findings of fact or conclusions of law filed herein, and no request therefor, we conclude it to be our duty to affirm the judgment of the lower court, if there be evidence to support it upon any theory of the case. 3 Tex.Jur. (Appeal & Error) page 1006, Secs. 718, 750; 1 Tex.Jur.1937 Supp. Secs. 718, 750. All assignments and propositions of appellant being overruled, this cause is accordingly affirmed.

Affirmed.